EQUITABLE LIFE ASSURANCE SOCIETY v. LAURA V. LIDDELL.

Decided April 18, 1903.

**1.—Life Insurance—Answers in Application—Drinking Habit.**

Where the form of the questions in the application for a life policy and the accompanying instructions to the medical examiner indicated that the information sought as to the use of intoxicating liquors was the applicant's habit or practice in that respect, and he having stated (his answers being made warranties) that he took a drink one a month, proof of occasional excesses did not show a breach of the warranty.

**2.—Same—Suicide—Evidence Not Establishing.**

Evidence in an action on a life policy held not sufficient to show that the death of the insured resulted from suicide and not from natural causes, the burden being on the defendant to establish the theory of suicide.

**3.—Continuance—Diligence.**

A motion for continuance based on the absence of a witness was properly overruled where subpoena for the witness was not issued until the eve of the trial, and no sufficient excuse was shown for not having it issued earlier.

Appeal from the District Court of Leon. Tried below before Hon. J. M. Smither.

*Chas. W. Ogden, L. T. Dashiell, J. M. Chatham,* and *Terrell & Terrell,* for appellant.

*S. W. Dean* and *William Watson,* for appellee.

GILL, ASSOCIATE JUSTICE.—This suit was brought by the appellee,

Laura V. Liddell, upon a policy of insurance issued by the appellant upon the life of her husband, J. A. Liddell. The appellant pleaded in defense a breach of the warranty of the assured as to his habits with reference to the use of alcoholic drinks, and further that deceased had committed suicide within one year after the date of the policy, which by express terms exempted the society from liability for death from such a cause. The cause was tried to the court without a jury, and judgment was rendered in favor of appellee for the full sum claimed.

The policy sued on was issued on April 24, 1901, upon application made in writing by the assured in which, in response to a question as to his use of alcoholic liquors, he answered that he took a drink once a month. By the terms of the policy the answer was a warranty. He died on the 27th day of October, 1901. Appellee was named in the policy as beneficiary, and has sued as such. But three questions are presented by the brief of appellant. (1) Did the insured in his application for the policy make false representations regarding his use of alcoholic liquors? (2) Did the court err in holding that deceased did not die by his own hand? (3) Did the court err in overruling appellant's motion for continuance?

There is evidence to the effect that deceased had occasionally drank to excess prior to the execution of the policy, but fails to show that deceased's habits of drink were otherwise than as indicated in his answer. Indeed the evidence does not show that he averaged a drink a month prior to the date of the policy. There is testimony to the effect that "he took a drink when he was where whisky was," but other evidence showed that he lived about twelve miles from any place where liquor was sold, and that his visits to that or any other place where liquor was sold was only occasional.

The questions propounded were:

"*Habits.*—Q. What is your practice as regards the use of spirits, wines, malt liquors or other alcoholic beverages?"

"Answer. A drink once a month."

"Q. Have you ever been a free drinker? (If yes, it should be stated for how long and to what degree, and whether ever delirium tremens, or other injury to health.)

"Answer. No."

The following clause was a part of the special instructions to the society's medical examiner, as shown on his report:

"In reporting overindulgence in drink, draw the line—since there must be some fixed standard—at Anstie's limit of a daily allowance equivalent to one and a half ounces of absolute alcohol. Such allowance will be represented, in the case of ardent spirits, by three ounces; of sherry or other strong wine, by one pint bottle; of strong ale or porter, by three tumblerfuls; and of light ale or beer, by four or five tumblerfuls."

This and the form of the question clearly indicates that the infor-

mation sought was the applicant's habit or practice in the respect inquired about. If this is true, then proof of occasional excesses does not show a breach of the warranty.

In Mutual Life Insurance Co. v. Simpson, 28 S. W. Rep., 837, a like principle is laid down and the case is practically in point upon this question. The judgment was reversed on writ of error to the Supreme Court, 88 Texas, 333, but that portion of the opinion of the Court of Civil Appeals above referred to, while the subject of some difference of opinion among the members of the higher tribunal, was not disturbed. The authorities cited by Justice Williams in Simpson's case, supra, amply support his conclusion that where a question is addressed to a former habit of drink and the answer is "Not at all," proof of occasional excessive drinking not amounting to a habit does not show a breach of the warranty. In this case no habit of drink is shown to have existed either before or after the date of the policy. We think the court was authorized to conclude from the evidence that defendant had failed to establish a breach of the warranty in the respect complained of.

The policy provided that the insurer should not be responsible if the assured committed suicide within twelve months from the issuance of the policy, and appellant insists that the court erred in holding that the evidence failed to establish suicide.

The testimony shows that assured was a practicing physician residing in Leon County, about twelve miles from Centreville, the county site. That within two years of his death he had lost four children, two of them having died but a short time before his death. He was deeply grieved at the death of his children, but bore up bravely and comforted his wife. On Friday before his death he went to Centreville, and came home that night somewhat under the influence of liquor. Brought a half pint of whisky with him. He ate no supper that night, and complained of feeling bad. Ate no breakfast nor dinner next day, and said he wanted no supper, but drank a glass of buttermilk. He ate no breakfast Sunday morning, but rode off on his horse. He had attended to his professional duties on Saturday, and on Sunday morning called at Bob Spillers' to attend a sick child. About 12 o'clock on the day of his death he was seen on horseback on the road near the cemetery. He said good morning to a friend who passed him, but nothing more, and it seemed there was something the matter with him. He was found about sundown in the cemetery in a dying condition. He had procured a plank about the length of himself; had laid it under a cedar tree at the foot of the graves of his two children; had taken off his coat, made a pillow of it, and lay down on the plank. He was unconscious when found, and never regained consciousness.

Dr. Clark Turner, who saw him some time after he was found, testified to symptoms of morphine poisoning, and that he found on deceased's person a vial of tablets which he took to be morphine. This witness testified to the presence of other symptoms inconsistent with the mor-

phine theory, but which might indicate some other poison. He finally expressed the opinion that deceased came to his death as a result of a combination of poisonous drugs. As to the symptoms displayed by the dying man, he was contradicted by other witnesses, and was shown to have made inconsistent and contradictory statements at the inquest. The value of his testimony was addressed to the trial judge, who seems to have disregarded it, and we can not say he should not have done so. It was also shown that the death of deceased might have been brought about by the cumulative effect of doses of morphine, taken not with suicidal intent, but to alleviate pain, and it was shown that deceased was suffering from neuralgia.

It was further shown in support of the suicide theory that deceased had failed to get his medical certificate; that he was melancholy over his gloomy financial prospects. He had inquired of a friend as to the suicide clause in insurance policies, and stated that he did not think they should be permitted to be so written. This same witness testified that he, deceased, said the way his affairs then stood his family would be better off if he were dead. Another witness testified that deceased had stated the day before that he had been drunker Friday than he had been in ten years, and that his wife "had got after him about it."

Under this evidence appellant contends that the conclusion was irresistible that deceased committed suicide, and that the trial court should have so found. We concede that the evidence points strongly in that direction, but the burden of proof is on the appellant upon this issue, and other evidence in the case renders it probable that deceased came to his death from natural causes, or else that nontoxic doses of morphine had acted cumulatively upon his heart, the action of which had already been weakened by liquor, and that the suicidal purpose was not present. It was shown that he was busy winding up his affairs preparatory to moving to Centreville. That he had rented a house there and planted a garden. That his every act indicated preparation for and hope of a continuation of life. He bade farewell to neither friend nor loved one and left no note or other indication of a purposed death. He was ill and suffering with neuralgia, and went to the shade of the trees near the children's graves perhaps to rest and escape the heat. It was shown to be a hot day. He took the precaution to get in the shade, and to use the language of one of the witnesses, "he had made himself comfortable." In this state of the record we are not able to say that the court should have arrived at a different conclusion.

A motion for continuance was made to enable the appellant to procure the testimony of Bob Spillers, whose house deceased had visited the day of his death. Appellant claimed this witness would testify that deceased had said to him that he intended to end his life. The subpoena for this witness was issued on the eve of the trial, when the witness had temporarily left the county. No sufficient excuse was given for not making an earlier effort to procure his testimony, and we

think the trial court correctly held that the appellant had been negligent in not sooner learning of the witness and of the knowledge he claimed to possess.

None of the other assignments require our notice. We have found no reversible error. The judgment is affirmed.

*Affirmed.*

Writ of error refused.